# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 92-KA-00475-SCT

*TINA MARIE HUNT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/4/91 |
| TRIAL JUDGE: | HON. WILLIAM R. LAMB |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | PHIL R. HINTON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | NA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 8/8/96 |
| MOTION FOR REHEARING FILED: | 8/22/96 |
| MANDATE ISSUED: | 2/6/97 |

**EN BANC.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

## I. STATEMENT OF THE CASE

¶1. Tina Marie Hunt was convicted for the murder of her husband, Thomas A. Hunt, and sentenced to life imprisonment. Her motion for a new trial was denied. She appeals, *in forma pauperis*, and raises the following issues:

> A) WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE A STATEMENT TAKEN IN VIOLATION OF TINA HUNT'S CONSTITUTIONAL RIGHTS?
>
> B) WHETHER TINA HUNT WAS DENIED A FAIR TRIAL BECAUSE THE STATE INTERFERED WITH DEFENSE COUNSEL'S FREE ACCESS TO WITNESSES?
>
> C) WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED TINA HUNT FUNDS TO EMPLOY AN INVESTIGATOR, DENYING HUNT HER CONSTITUTIONAL RIGHTS?

D) WHETHER THE TRIAL COURT ERRED BY REFUSING TO INSTRUCT THE JURY AS TO THE PROPER BURDEN OF PROOF BORNE BY THE STATE, SINCE THE PROOF AGAINST TINA HUNT WAS CIRCUMSTANTIAL?

E) WHETHER THE COURT ERRED BY ADMITTING INTO EVIDENCE A COPY OF A DOCUMENT, UNDER CIRCUMSTANCES UNFAIR TO TINA HUNT AND WHERE ALTERATION WAS SUSPECTED?

F) WHETHER THE TRIAL COURT ALLOWED INTO EVIDENCE PROOF OF OTHER CRIMES OR OTHER WRONGS WHICH WERE IRRELEVANT OR, IF RELEVANT, SUBSTANTIALLY OUTWEIGHING THE PROBATIVE VALUE OF THE EVIDENCE?

G) WHETHER THE COURT ERRED BY DENYING TINA DISCOVERY, DUE UNDER RULE 4.06 OF THE UNIFORM CRIMINAL RULES OF CIRCUIT COURT PRACTICE, AND BY DENYING A DELAY IN THE TRIAL SETTING?

H) WHETHER THE TRIAL COURT ERRED BY APPOINTING TINA'S ATTORNEY TO REPRESENT HER ON APPEAL WITHOUT COMPENSATION, IN VIOLATION OF THE CONSTITUTIONAL RIGHTS OF BOTH TINA HUNT AND HER APPOINTED ATTORNEY?

## II. STATEMENT OF THE FACTS

¶2. Thomas Hunt (Thomas) married Tina Marie Hunt (Tina) in February 1989. On the evening of December 15, 1990, Thomas, age twenty-two, Tina, age twenty, and their 15-month-old son rode in Thomas' blue Mustang to Ashland, Mississippi. In Ashland, Thomas and Tina met two friends from junior college, Scott Hindman (Hindman) and Russ Brown (Brown). Hindman and Tina were allegedly lovers.

¶3. Those five then traveled to Holly Springs in Brown's Chevrolet. Hindman was driving; he pulled the car onto a dirt road, and the three men got out of the car. Tina, who remained in the car with her baby, heard "several licks" coming from behind the car. Later, Brown told Tina that they had beaten Thomas with an axe handle. Hindman, Brown, and Tina left Thomas on the roadside, where he subsequently died of asphyxiation.

¶4. Hindman, Brown, and Tina returned to Ashland with the baby and picked up Thomas' blue Mustang. Officer R. D. Marlar of the Mississippi Highway Patrol was working a roadblock on Highway 4, east of Ripley that night. At 11:10 p.m., Officer Marlar saw Thomas' car; Hindman was driving, and he had a woman and a baby as passengers. Brown followed closely behind in the Chevrolet.

¶5. Brown had no driver's license, he smelled of alcohol, and there were beer cans in his car. Patrolman Marlar asked Brown to perform a field sobriety test, which was under the statutory limit. During the stop Officer Marlar saw an axe handle in the Chevrolet and noticed red stains on Brown's pants. Brown explained that the red stains were ketchup. Because there were spilled french fries in the Chevrolet, Officer Marlar accepted this explanation and allowed both cars to pass.

¶6. Later, Brown drove Thomas' Mustang to a field and took Thomas' wallet from the vehicle.

According to Tina, Brown said he was going to make the murder look as if someone had robbed Thomas and stolen his car.

¶7. At dawn, on December 16, 1990, a passerby discovered Thomas' body near a field road about ten miles outside Holly Springs, Mississippi. Mr. Reece went to a nearby store and notified the Marshall County Sheriff's Office. Because there were indications that the deceased might be from Benton County, the Benton County Sheriff, Arnie McMullen, was called to identify the body. Sheriff McMullen, however, could not identify Thomas.

¶8. Around noon on Sunday, the day after the murder, Tina Hunt and Scott Hindman went to Sheriff McMullen's office in Ashland to report Thomas as missing. Tina told the sheriff of the last occasion on which she had seen Thomas. The sheriff noted that her description of Thomas matched the description of the body that he had just attempted to identify in Marshall County. He asked Tina to go with him to identify Thomas' body, which she did. At 3:30 p.m., they returned to Ashland. Sheriff McMullen asked Tina to talk to Lieutenant Dickerson, a State Investigator. Lieutenant Dickerson noted a conflict between the statement Tina gave him and his understanding of what she had told the sheriff earlier. At some point, after 4:00 p.m. Tina telephoned her parents; they called Attorney Joey Langston of Booneville.[1] Lieutenant Dickerson advised Tina of her *Miranda* rights at 5:00 p.m. She signed a waiver of rights form at 5:10 p.m. Lieutenant Dickerson proceeded to question other witnesses but did not question Tina again until 6:40 p.m. Telephone records showed that Attorney Langston telephoned for Tina at 6:21 p.m. and again at 6:28 p.m., but was not allowed to speak to her. Lieutenant Dickerson interviewed Tina from 6:40 p.m. to 7:05 p.m.; during this interview, Tina made self-incriminating statements.

¶9. At trial witnesses testified that Tina did not like being married to Thomas and that she wanted Thomas to be killed because he would not give her a divorce. Hindman and Tina were allegedly lovers. Witness Matt Crocker testified that he had seen notes passed between Tina and Hindman, which discussed Thomas' death. In addition, Crocker had overheard Tina and Hindman discuss the purchase of a gun with which to kill Thomas, and he had seen Hindman with an axe handle the night before the murder was committed.

¶10. Tina, Brown, and Hindman were indicted on February 19, 1991, and charged with the capital murder of Thomas Hunt on or about December 15, 1990. Tina's co-defendants, Brown and Hindman, prior to trial entered pleas of guilty to the reduced charges of manslaughter, and the State moved to reduce Tina's charge to that of murder.

¶11. Tina's case was tried before a jury on December 2, 3, and 4, 1992. Following all the evidence, the jury returned a verdict of guilty on the charge of murder. Subsequently, the trial court entered a judgment sentencing Tina Marie Hunt to life in prison.

### III. ANALYSIS

A) WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE A STATEMENT TAKEN IN VIOLATION OF TINA'S CONSTITUTIONAL RIGHTS?

¶12. Tina voluntarily went to the sheriff to give a false "missing person" report on her husband. She

gave details to Sheriff McMullen and agreed to go with him to identify a body. Sheriff McMullen then asked her to talk to Lieutenant Dickerson to give the statement of her "missing" husband for him to record. She was not the target of any investigation at this time, nor a suspect in Thomas' murder. When Lieutenant Dickerson noted a conflict between the statement Tina gave him and his understanding of what she had told the sheriff earlier, he advised Tina of her *Miranda* rights at 5:00 p.m. She signed a waiver of rights form at 5:10 p.m. During this interview, Tina made self-incriminating statements of the murder of her husband.

¶13. Tina contends that she made two requests for counsel. First, she asked if she needed an attorney before she made a statement. She did not request an attorney be appointed for her. Officer Dickerson told her "not yet," Tina also alleges that later, after she received her *Miranda* warnings, she asked for an attorney. She asserts that Dickerson then told her she could not have an attorney.

¶14. Tina contends that her Fifth Amendment right to counsel was violated in this case. The standard of reviewing the admission of a confession is well-settled. "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Lee v. State*, 631 So. 2d 824, 826 (Miss. 1994) (quoting *Balfour v. State*, 598 So. 2d 731, 742 (Miss. 1992)); *Ricks v. State*, 611 So. 2d 212, 214 (Miss. 1992). The trial judge ruled that the statement was freely and voluntarily given after the *Miranda* rights had been administered.

¶15. Whether Tina's Fifth Amendment right to counsel was violated depends on whether she was (a) in custody and (b) being interrogated. A person's Fifth Amendment right to counsel is not triggered by general on-the-scene questioning and/or any voluntary statement. *Miranda v. Arizona*, 384 U.S. 436, 477-78 (1966); *Porter v. State*, 616 So. 2d 899, 907 (Miss. 1993). Clearly, when a person who is in custody and is being interrogated requests an attorney, the police's questioning must cease until one is provided. *Miranda*, 384 U.S. at 445; *Minnick v. Mississippi*, 498 U.S. 146, 147 (1990); *Mettetal v. State*, 602 So. 2d 864, 868 (Miss. 1992). On the other hand, if Tina's first alleged request for an attorney took place in a non-custodial setting, her Fifth Amendment right to counsel was not implicated. *McNeil v. Wisconsin*, 501 U.S. 171, 177-78 (1991); *United States v. Harrell,* 894 F.2d 120, 125 (5th Cir. 1990).

¶16. Clearly, Tina had been asked to give a statement and she was being questioned; therefore, she was being interrogated. Thus, whether Tina was denied her Fifth Amendment right to counsel depends on whether she was "in custody."[2] The test for whether a person is in custody is whether a reasonable person would feel that she was in custody. That is, whether a reasonable person would feel that she was going to jail -- and not just being temporarily detained. *Compton v. State*, 460 So. 2d 847, 849 (Miss. 1984). *See also, Berkemer v. McCarty*, 468 U.S. 420 (1984). The officer's subjective intent is irrelevant. *Stansbury v. California*, 511 U.S. 318 (1994).

¶17. Whether a reasonable person would feel that she was "in custody" depends on the totality of the circumstances. Factors to consider include: (a) the place of interrogation; (b) the time of interrogation; (c) the people present; (d) the amount of force or physical restraint used by the officers; (e) the length and form of the questions; (f) whether the defendant comes to the authorities voluntarily; and (g) what the defendant is told about the situation. *See People v. Goyer*, 638 N.E. 2d 390, 393-94 (Ill. App. Ct. 1994).

¶18. Considering the totality of the circumstances, the record reflects that Tina and Dickerson's conversation about an attorney occurred prior to her being in custody. It is undisputed that she voluntarily went to the sheriff's office to report Thomas as missing. She was questioned during the late afternoon for a relatively short period of time, during which, she was alone with Officer Dickerson. She was not physically restrained, but she contends that she was told she could not leave until she gave a statement to Officer Dickerson. Thus, Tina was detained temporarily in order to obtain a missing-person report. More importantly, she went voluntarily to the sheriff's office for the express purpose of making such a report.[(3)] Therefore, the trial judge did not commit manifest error by admitting her self-incriminating statement.

¶19. "Once the trial judge has determined at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal." *Sills v. State*, 634 So. 2d 124, 126 (Miss. 1994) (quoting *Frost v. State*, 483 So. 2d 1345, 1350 (Miss.1986) ). "Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context." *Foster v. State*, 639 So. 2d 1263, 1281 (Miss. 1994) (citations omitted). The trial judge's decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence. *Id.* Where the evidence is contradictory, this Court "generally must affirm." *Lesley v. State*, 606 So. 2d 1084, 1091 (Miss. 1992) (citations omitted). Based on the foregoing analysis, the trial judge's admission of Tina's statement is affirmed.

### B. WHETHER THE DEFENDANT WAS DENIED A FAIR TRIAL BECAUSE THE STATE INTERFERED WITH DEFENSE COUNSEL'S FREE ACCESS TO WITNESSES?

¶20. Tina contends that she was denied a fair trial because the State advised State witnesses to have a prosecutor's representative present when they were interviewed by defense counsel. Prior to trial, Tina's Motion to Enjoin Prosecutor from Interfering with Defendant's Investigation was denied.

¶21. Witnesses Roberta Leonard, and her mother, Mary, testified that a State investigator told them to contact the prosecutor's office if another attorney called, but that they were not barred from speaking to other attorneys. They stated that the investigator asked them to postpone any interviews with defense attorneys until a prosecutor could be present. Witness Leah Poteet testified that she asked if the State would send a representative to be present when defense counsel asked her questions.

¶22. Mississippi case law has not addressed this question directly, but this Court has stated that trial courts should not allow "arbitrary" denial of a defendant's right to consult State witnesses, if they are willing to talk to the defendant's counsel. *Scott v. State*, 359 So. 2d 1355, 1358 (Miss. 1978). This Court has upheld a trial court in requiring State's counsel to be present during a defendant's interview of a rape victim and her grandmother, where the rape victim was a minor. *Cannon v. State*, 190 So. 2d 848, 850 (Miss. 1966). Here, however, the State suggested or advised that it would be best for a State representative to be present, while making it clear that the witnesses were free to speak to Tina's counsel.

¶23. This Court recognizes that the State's refusal to allow any defense interviews with State witnesses violates due process guarantees. *Gregory v. United States,* 369 F.2d 185 (D.C. Cir. (1966) , *cert. denied*, 396 U.S. 865 (1993). However, in the case *sub judice*, the State advised these witnesses to have a State representative present at interviews; they did not refuse to allow the

witnesses to speak with defense counsel. Thus, there was no reversible error in the trial court's denial of Tina's pre-trial motion regarding this matter. ***Accord, Nichols v. State***, 624 So. 2d 1325,1327 (Ala. 1992)

> C. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED TINA HUNT FUNDS TO EMPLOY AN INVESTIGATOR, DENYING TINA HER CONSTITUTIONAL RIGHTS?

¶24. Tina also argues that her motion for funds to hire an investigator should have been granted because the State provided only partial information on only thirty of the seventy-two anticipated witnesses listed by the State. The State conceded that several of the witnesses they listed lacked addresses or phone numbers.

¶25. However, the trial court denied Tina's motion and ruled that it could not find a sufficient need to justify an investigator. Tina's counsel moved unsuccessfully for a continuance; the motion was based on the demands of investigating the discovery still being produced by the State. Defense counsel noted he had forty-five to fifty witnesses left to interview, and that he could not complete those interviews in the time remaining prior to trial.

¶26. The standard of review in Mississippi on this issue is as follows: to reverse, the trial court's denial of expert assistance must be an abuse of discretion "so egregious as to deny [the defendant] due process and where [the defendant's] trial was thereby rendered fundamentally unfair." ***Fisher v. City of Eupora***, 587 So. 2d 878, 883 (Miss. 1991). ***See Johnson v. State***, 529 So. 2d 577, 590 (Miss. 1988). "Undeveloped assertions" that expert assistance will be helpful are insufficient. ***Griffin v. State***, 557 So. 2d 542, 550 (Miss. 1990).

¶27. Tina has failed to demonstrate how her inability to interview these witnesses hurt her at trial. Specifically, Tina does not show any prejudice from her inability to interview all of these witnesses. Therefore, this issue lacks merit.

> D. WHETHER THE TRIAL COURT ERRED BY REFUSING TO INSTRUCT THE JURY AS TO THE PROPER BURDEN OF PROOF, SINCE THE PROOF AGAINST TINA HUNT WAS CIRCUMSTANTIAL?

¶28. At trial, the State requested and received jury instruction S-1, which stated that the burden of proof for the State is proof beyond a reasonable doubt. The trial court refused Tina's proposed "circumstantial evidence" instruction, which would have stated that the burden of proof is proof beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence. The trial court found that the evidence of Tina's oral statements in which she wished for Thomas' death was direct evidence, making S-1 correct. In addition, the State argues that since Tina gave an inculpatory statement to the police, the circumstantial evidence instruction was inappropriate.

¶29. This Court has held that a circumstantial evidence instruction is necessary only where the evidence is "wholly circumstantial." ***Windham v. State***, 602 So. 2d 798, 800 (Miss. 1992). ***See cf., Jones v. State***, 635 So. 2d 884, 886-87 (Miss. 1994). Where a confession exists, a circumstantial evidence instruction is unnecessary. ***Ladner v. State***, 584 So. 2d 743, 750 (Miss.), ***cert. denied***, 502

U.S. 1015 (1991). Tina admits that her statement wishing Thomas dead is circumstantial evidence of intent in the crime charged. However, this Court has recently distinguished the element of intent from other elements by allowing the State to use circumstantial evidence to prove intent, without the circumstantial evidence instruction. *Jones v. State*, 635 So. 2d 884, 886-87 (Miss. 1994). Therefore, this Court affirms on this issue. [(4)](#)

> E. WHETHER THE COURT ERRED BY ADMITTING INTO EVIDENCE A COPY OF A DOCUMENT UNDER CIRCUMSTANCES UNFAIR TO TINA HUNT AND WHERE ALTERATION WAS SUSPECTED?

¶30. Tina alleged that her attorney was barred from speaking to her. Joey Langston, a Booneville attorney, testified that he attempted to speak by telephone at 6:21 and 6:28 p.m. -- shortly before she gave her written statement. Langston alleged that the police dispatcher told him that Tina could not come to the telephone. The dispatcher disputed Langston's assertion, and testified that Langston did not call. She used a phone log from the Benton County Sheriff's Department, which she maintained, to refresh her memory that Langston did not call. The phone log was not admitted into evidence, but marked Exhibit No. 1 for Identification Only.

¶31. Tina asserts that the admission of this phone log violated the Best Evidence Rule, as stated in Mississippi Rule of Evidence 1002. However, the telephone log was not admitted. Furthermore, a document used to refresh one's recollection under Mississippi Rule of Evidence 612 does not have to be admissible under the Mississippi Rules of Evidence. *Livingston v. State*, 525 So. 2d 1300, 1303 (Miss. 1988); *Gardner v. State*, 455 So. 2d 796, 799-800 (Miss. 1984). The only requirement is that the witness have no present memory of the event. *Scott v. State*, 446 So. 2d 580, 585 (Miss. 1984).

¶32. It is clear that Ada Tucker, the police dispatcher, stated that she could not "remember all those calls" on the day in question. Thus, she testified to her lack of memory before she received a copy of the phone log. Therefore, the necessary predicate for use of the log was made.

¶33. Tina complains that Tucker did not make the copy which was used to refresh her memory. There is no requirement under Mississippi Rule of Evidence 612 that the witness make and use her own copy of the document used to refresh her recollection. Tina also complains that she did not see the original of the document which Tucker used to refresh her memory. Mississippi Rule of Evidence 612 states that the adverse party has the right to review the document used to refresh a witness' memory, but makes no mention of the original of a document. *Lambert v. State*, 524 So. 2d 576, 579 (Miss. 1988). Furthermore, Tina did not object on that ground. As a result, this assertion of error is barred for lack of timely objection. *Box v. State*, 610 So. 2d 1148, 1154 (Miss. 1992). Therefore, this assignment of error has no merit.

> F. WHETHER THE TRIAL COURT ALLOWED INTO EVIDENCE PROOF OF OTHER CRIMES OR OTHER WRONGS WHICH WERE IRRELEVANT OR, IF RELEVANT, WITH PREJUDICIAL EFFECT SUBSTANTIALLY OUTWEIGHING THE PROBATIVE VALUE OF THE EVIDENCE?

¶34. Two witnesses testified that Tina was having affairs with Hindman and another person. Tina argues that the admission of evidence of these affairs was incorrect under Mississippi Rule of Evidence 404(b), which governs character evidence. Tina further asserts that, even if admission of

evidence of these affairs was valid under Mississippi Rule of Evidence 404(b), it was substantially more prejudicial than probative, and thereby violated Mississippi Rule of Evidence 403. The State asserts that evidence of her affairs was probative under Mississippi Rules of Evidence 403 and 404(b), to show intent to eliminate Thomas Hunt.

¶35. Evidence of wrong acts is admissible to prove motive, provided that such evidence conforms with Mississippi Rule of Evidence 403. *Hogan v. State*, 580 So. 2d 1275, 1277 (Miss. 1991). Bad acts, such as adultery, may be admissible to prove motive. However, they are inadmissible, if (1) the affairs are not proven as more than suspicions, (2) they took place years before the crime, and (3) they involved people unrelated to the crime. *Lesley v. State*, 606 So. 2d 1084, 1090 (Miss. 1992).

¶36. In contrast, Tina's affair with Hindman was amply supported by evidence. Hindman was openly calling Tina his girlfriend in her presence only weeks before the murder, without any objection from Tina. At the same time, Tina was saying that she could not get a divorce, and that she would like to see Thomas Hunt dead. In addition, Hindman was a principal to the killing, and he pled guilty to manslaughter in connection with this case. Furthermore, Hindman went to the police station with Tina to report the fact that Thomas was missing.

¶37. One witness testified that Tina was having an affair with another person, who was not involved in Thomas Hunt's death. Although this alleged paramour did not assist in killing Thomas, the information was admissible since Tina admitted that her ongoing love for this man occurred just three months before Thomas' death. There is no reversible error here.

> G. WHETHER THE TRIAL COURT ERRED BY DENYING TINA HUNT DISCOVERY, DUE UNDER RULE 4.06 OF THE UNIFORM CRIMINAL RULES OF CIRCUIT COURT PRACTICE, AND BY DENYING A DELAY IN THE TRIAL SETTING?

¶38. Tina asserts that the State failed to supply her with the names of the witnesses it intended to call at trial. Less than two weeks before trial, the State gave Tina a potential witness list, which consisted of 72 names. The trial court denied Tina's motion for the State to produce the names of witnesses who would actually testify. Tina requested a continuance because she had 45 people on the list left to interview. The request was denied.

¶39. Tina argues that the State's failure to provide the intended witness list deprived her of a fair trial. In addition, Tina states that her inability to interview all of these witnesses warranted a continuance until her counsel could interview them and prepare for trial.

¶40. Clearly, a request for the State's witnesses in chief is sufficient to compel the State's production of this information, under Uniform Circuit Court Rule 4.06. This Court addressed the requirements of Rule 4.06 in *Reuben v. State*, 517 So. 2d 1383, 1385-86 (Miss. 1987):

> [The appellant] filed a motion which, under Rule 4.06, was sufficient to impose upon the State the duty of disclosing the names and addresses of all witnesses *that the State intended to call during their case-in-chief.* (emphasis added).

*Reuben*, 517 So. 2d at 1385-86.

¶41. Thus, at first blush, it appears that Tina was entitled to the requested information under Rule

4.06. However, the purpose of Rule 4.06 is to avoid ambush or unfair surprise to either party at trial. *Frierson v. State*, 606 So. 2d 604, 607 (Miss. 1992) (citing *Robinson v. State*, 508 So. 2d 1067, 1070 (Miss. 1987)); *Holland v. State*, 587 So. 2d 848, 866-67 (Miss. 1991). Tina has not shown that a lack of discovery worked to her detriment. Moreover, Mississippi Rule of Evidence 103(a) provides that "[e]rror may not be predicatedupon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Tina has neither contended nor demonstrated that previously undisclosed evidence introduced at trial took her by surprise, prejudiced her, or affected one of her substantial rights. Therefore, her arguments on this point are without merit.

### H. WHETHER THE TRIAL COURT ERRED BY APPOINTING TINA HUNT'S ATTORNEY TO REPRESENT HER ON APPEAL WITHOUT COMPENSATION, IN VIOLATION OF THE CONSTITUTIONAL RIGHTS OF BOTH TINA AND HER APPOINTED ATTORNEY?

¶42. The trial court denied Tina's counsel any fees for appellate preparation because Tina's counsel agreed to a contract to represent Tina before trial. Tina's counsel asserts that this denial is an unconstitutional taking of his property (time). Tina asserts her Sixth Amendment right to counsel and claims that an unpaid attorney might not produce the quality of work a compensated attorney would give.

¶43. Phil Hinton was eventually employed by Tina Hunt to defend her against the murder charge on an hourly basis. Tina's family guaranteed Hinton a minimum amount of $10,000. In addition to this criminal charge, Hinton also represented Tina in a civil child custody case against the Department of Human Services. The record does not indicate whether the $10,000 minimum applied solely to the criminal case or included both cases.

¶44. After the murder trial, Hinton moved for judgment notwithstanding the verdict (J.N.O.V.). At the hearing on that motion, Hinton also moved to represent Tina on appeal. He stated that the possibility of representation on appeal was not discussed when he was hired by Tina. Hinton had already received a fee of $11,000 for his representation at trial. (R. 890).

¶45. Hinton also presented evidence of Tina's indigence and of her inability to pay for an appeal. The trial court allowed Tina to proceed on appeal *in forma pauperis* and appointed Hinton to represent Tina on appeal. By court order, the matter of appeal fees for Hinton was taken under advisement and subject to further hearings. On the record, the trial judge denied at that time any fee to appeal the case, and held the attorney to his initial fee arrangement with Tina on an hourly rate.

¶46. Hinton's argument before this Court is that he is entitled to be paid an additional fee of $2,000 for the trial and appeal under Miss. Code Ann. § 99-15-17 (1994 Supp.), which provides that defense counsel may receive a maximum of $1,000 for a criminal trial and $1,000 in appeal fees. This Court has provided that additional monies for the defense counsel's overhead expenses are also to be paid. *Wilson v. State*, 574 So. 2d 1338, 1340-41 (Miss. 1990); *Pruett v. State*, 574 So. 2d 1342 (Miss. 1990).

¶47. In the case at hand, Tina paid her counsel $11,000 to defend her. According to Miss. Code Ann. § 99-15-17, Tina's counsel could have been entitled to $2,000 for the trial and appeal. Subtracting $2,000 from the $11,000 actually paid leaves $9,000 that Tina's counsel received, over the statutory

maximum. Tina's counsel does not show how his overhead expenses exceeded that $9,000 figure. Therefore, there is no merit in this assignment of error.

¶48. Furthermore, this case raises concerns about the propriety of an attorney's receiving a large sum of money from the client, having the client declared indigent, and then petitioning the court for more money with which to defend that client. Although the attorney is entitled to the statutory sum as well as to overhead costs, this Court interprets the statute and related case law very narrowly. That is, an attorney who has received from a client an amount equal to or greater than that which he would have been entitled to by law is not allowed to receive more money from the county when that client is declared indigent.

## IV. CONCLUSION

¶49. The issues raised by the appellant in this case are without merit. Tina was not in custody when she asked for an attorney; her Fifth Amendment right to counsel had not yet attached and, therefore, was not violated. Furthermore, the trial court did not commit reversible error by denying Tina's Motion to Enjoin Prosecutor from Interfering with Defendant's Investigation or by denying Tina funds with which to employ an investigator. The jury was properly instructed with regard to the burden of proof; the facts in this case did not require that a circumstantial evidence instruction be given. Moreover, the phone log was properly used to refresh the memory of witness Tucker, the police dispatcher. Evidence of Tina's alleged affair(s) was more probative than prejudicial and was, therefore, properly admitted. In addition, Tina has not shown that she was prejudiced by the State's pre-trial failure to provide more specific information regarding some of the witnesses. Finally, no error was committed by the trial court's refusal to allow additional payment of $2,000 from the county to Tina's attorney, when the attorney had already received over $11,000 from private sources. Thus, this appeal lacks merit, and the judgment of the trial court is affirmed.

¶50. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**LEE, C.J., ROBERTS, SMITH AND MILLS, JJ., CONCUR. SULLIVAN, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, BANKS AND McRAE, JJ.**

**SULLIVAN, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶51. Because I feel that the majority has misrepresented the facts and the law in this case, I dissent. It is the majority's affirmance on the first (A), third (C), and seventh (G) issues with which I must emphatically disagree.

¶52. Hunt's first assertion on appeal is that her written statement was taken in violation of her right against self-incrimination. The majority holds that Hunt's statement was not made in violation of her

*Miranda* rights because her requests for counsel were made in a non-custodial interrogation.

¶53. The majority states that "[c]learly, Tina had been asked to give a statement and she was being questioned; therefore, she was being interrogated." I certainly agree that Hunt was being interrogated, but the fault I see in the majority's thinking is that Hunt was not in custody. According to our jurisprudence, the establishment of custody depends on whether a reasonable person, under the totality of the circumstances, would feel that she was in custody.

¶54. The case law shows that the presence of certain factors tends to establish the existence of custody in connection with the determination of whether one was subjected to custodial interrogation for *Miranda* purposes. Certain factors are generally relevant to the analysis of custody, and the majority includes these factors. We have emphasized, however, that no single element is dispositive in this determination, nor must all of the factors be present to find a custodial interrogation. Furthermore, we must engage in a case-by-case analysis with respect to an evaluation of these factors.

¶55. Because I feel that the majority misrepresents the relevant facts of this case which ineluctably develops the finding of custody, I will provide a chronology:

**Noon**

Tina Hunt arrives at the Benton County Sheriff's office.

**3:30 p.m.**

Tina returns to the Benton County Sheriff's Office with Sheriff McMullen after identifying the body of Thomas Hunt. (Trial Transcript 551). **Tina was told that she could not leave until she was interrogated by Lt. Dickerson**. (Trial Transcript 107-09).

**5:10 p.m.**

Lt. Dickerson advised Tina of her *Miranda* rights and she signed a Rights Waiver. (Trial Transcript 108, 143). Thereafter **she was told she could not leave** while Lt. Dickerson got the written statement of Scott Hindman. **Tina asked Lt. Dickerson if she needed to call an attorney and he said no not yet**. (Trial Transcript 111, 137).

**6:21 p.m. and 6:28 p.m.**

Attorney Langston called the Benton County Sheriff's Office and attempted to speak with Tina. (Trial Transcript 152-54). **Tina overheard the dispatcher tell Langston that she was not allowed to speak with anyone**. (Trial Transcript 112).

**6:30 p.m.**

Lt. Dickerson came out of an interrogating room where he had gotten the written confession of Scott Hindman and **Tina again asked for her attorney. Lt. Dickerson told her no**. (Trial Transcript 111, 137).

**6:40 p.m.**

Lt. Dickerson took a written statement from Tina.

¶56. Dickerson adequately informed Hunt of her *Miranda* right to counsel. She understood that right. Thus, when Hunt verbally indicated that **she wanted to talk to a lawyer, after she signed her rights waiver, she invoked her right to counsel**. The law provides that the interrogation must cease if the suspect indicates in any manner, at any time prior to or during questioning that she wishes to remain silent or that she wants an attorney.

¶57. Thus, it is not what the majority states about Hunt's interrogation but what the majority does not state about her interrogation that makes it custodial. A reasonable person in Hunt's situation, having been read her *Miranda* warnings, hearing the dispatcher tell her lawyer that she was not allowed to speak to anyone, asking to leave and then being told that she could not, and being at the station for several hours, would believe that she was in custody.

¶58. Hunt had been at the police station for several hours and had undergone interrogation. It was after this that Hunt was read her *Miranda* rights. We have found that once custodial interrogation arises, then it must be preceded by advising the defendant of her right to remain silent and her right to an attorney. *Holland v. State*, 587 So. 2d 848, 855 (Miss. 1991) (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). Other courts hold that the reading of *Miranda* warnings does not raise a non-custodial interrogation to a custodial one. However, these cases, unlike Hunt's, do not involve other indicia of arrest. *See Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985) (Conditions at the station were as informal and the detectives took a dinner break at a reasonable hour, gave appellant a ride home, and agreed to meet later at a mutually convenient time. Appellant apparently understood that he was free to reject police requests for information; after initially agreeing to take a polygraph, he changed his mind and refused); *Commonwealth v. Mayfield*, 500 N.E.2d 774, 781-82 (Mass. 1986) (Mayfield, who was then only one of several suspects, went to the police station voluntarily by prearrangement. The officials told him he was free to leave anytime, and he did leave at the end of the session); *People v. McDaniel*, 619 N.E.2d 214, 224 (Ill. App. Ct. 1993) (Defendant repeatedly told that he was not in custody. The defendant responded that he understood. Further, he was allowed to take breaks from the questioning and speak with his family); *People v. Kircher*, 520 N.Y.S.2d 611, 611 (N.Y. App. Div. 1987) (*Miranda* warnings given at origin of an encounter, did not suggest that defendant was then in custody).

¶59. Another indication of custody in Hunt's case is the fact that an attorney was barred from speaking to her, before she gave incriminating statements. The majority asserts that the police do not have to tell a suspect when their attorney is trying to get in touch with them under *Moran v. Burbine*, 475 U.S. 412 (1986). Numerous jurisdictions have found otherwise. *See U.S. v. Scarpa*, 701 F. Supp. 379 (E.D.N.Y 1988), *cert. denied* 498 U.S. 816 (1990); *People v. McCauley*, 645 N.E.2d 923 (Ill. 1994); *West v. Commonwealth*, 887 S.W.2d 338 (Ky. 1994); *State v. Reed*, 627 A.2d 630 (N.J. 1993); *State v. Stoddard*, 537 A.2d 446 (Conn. 1988); *DeJesus v. State*, 655 A.2d 1180 (Del. Super. Ct. 1995); *People v. Page*, 907 P.2d 624 (Colo. Ct. App. 1995); *Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991); *Bryan v. State*, 571 A.2d 170 (Del. Super. Ct. 1990) ; *Roeder v. State*, 768 S.W.2d 745 (Tex. Ct. App. 1988).

¶60. The facts of *Burbine* and the one at hand differ in several important aspects. In *Burbine* the Court held that "[e]vents occurring outside of the presence of the suspect and entirely unknown to

him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right . . . ." ***Burbine***, 475 U.S. at 422. That is not so here. Hunt testified that she overheard one of the conversations between attorney Joey Langston and the dispatcher in which the dispatcher informed the attorney "Mr. Langston, I'm sorry, but they're not allowed to talk with anyone right now."

¶61. Also, in ***Burbine***, neither the voluntariness of the suspect's confession nor the possibility of police misconduct was an issue. Thus, it logically follows that **if Hunt was not in custody and free to leave, or do whatever it was she wanted, why was she not allowed to speak to an attorney**? "The sheriff obviously had no reason to prevent [Hunt] from conferring with [her] lawyer except to isolate [Hunt] from anyone who might make the investigators's job harder." ***Yates v. State***, 467 So. 2d 884, 888 (Sullivan, J., dissenting).

¶62. At 5:06 p.m. they advised Hunt of her ***Miranda*** rights and she signed a rights waiver at 5:10 p.m.. Lt. Dickerson then got the confession of Scott Hindman and did not talk to Hunt again or take a formal statement until 6:40 p.m.. Hunt stated that she asked Lt. Dickerson if she needed to call an attorney and was told no. This conversation occurred **after** she signed the rights waiver, at 5:10 p.m., but before the time that Dickerson took her written confession at 6:40 p.m.. Within that same period Hunt testified that she overheard one of the conversations with attorney Joey Langston and the dispatcher in which the dispatcher informed Mr. Langston that "they're not allowed to talk with anyone right now."

¶63. After Hunt heard the dispatcher tell an attorney that she was not allowed to talk with anyone, after being told that she was not allowed to leave, after being read her ***Miranda*** warnings, Dickerson came out from interrogating other witnesses and she asked him if she could call an attorney. Dickerson told her no. In the trial court's ruling on the Motion to Suppress, the trial judge stated that **he was not finding as a matter of fact that Tina Hunt did not request an attorney** and certainly he could not. Instead, he based his finding on her signing of a Waiver of Rights at 5:10 p.m. on the date in question. (Trial Transcript 343-46).

¶64. The trial judge found that the statement was freely and voluntarily given after ***Miranda*** rights had been administered, thus **the judge found that Hunt had been in custody for purposes of *Miranda***. The fact is that Tina Hunt gave her statement to police while she was in custody. In fact, the majority's opinion indirectly concedes this point by holding that the trial judge did not commit manifest error when he decided that Hunt "freely and voluntarily" gave her statement after she had been given ***Miranda*** warnings.

¶65. Lastly, Hunt asserted that she was told she could not leave; she was told to wait while Hindman was being interviewed. The record clearly shows that Hunt was told to stay while the officers conducted other interviews. Would a free person, one not in custody, be told that they could not leave?

¶66. The majority makes much of the fact that Hunt arrived at the police station voluntarily. Depending on the facts, such as the ones here, a voluntary custodial situation can be transformed into an involuntary one requiring ***Miranda*** warnings. ***State v. Victor***, 457 N.W.2d 431 (Neb. 1990), ***cert. denied*** 498 U.S. 1127 (1991). Based on the totality of the circumstances, it is clear that Hunt was in custody.

¶67. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court clarified the scope of custodial interrogation and stated in that regard:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point, he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

*Miranda*, 384 U.S. at 474-75 (footnote omitted).

¶68. Before police may initiate questioning, the accused must be informed of her constitutional rights, particularly her right to counsel and to remain silent, and the consequences of waiving those rights. *Miranda*, 384 U.S. at 474. Custodial interrogation must cease upon even an equivocal indication of a desire to assert those constitutional rights. *Id.* The admissibility of statements made after the accused has asserted her right depends on whether the police have "scrupulously honored" those rights by ceasing interrogation. *Michigan v. Mosley*, 423 U.S. 96, 102-03 (1975). Where an accused asserts the right to counsel, all interrogation must cease until a lawyer has been provided. Such interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

¶69. A suspect undergoing custodial interrogation following her request for the assistance of counsel carries a subtle, yet powerful, compulsion to make a self-incriminating statement. *See Arizona v. Roberson*, 486 U.S. 675 (1988); *Edwards v. Arizona*, 451 U.S. 477 (1981); *Miranda v. Arizona*, 384 U.S. 436 (1966). "Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Roberson*, 486 U.S. at 681 (citing *Edwards*, 451 U.S. at 484-85).

¶70. The purpose of the required warnings is to counteract the coercive atmosphere underling a custodial interrogation by the police, to afford added protection to the liberty against compulsory self-incrimination under the Fifth Amendment and to reduce the risk of involuntary statements. This postulate, that the danger of coercion results from the interaction between official interrogation and police custody, defines the need for the *Miranda* warnings.

¶71. Based upon this determination, Hunt's statements to authorities were obtained in violation of her Fifth Amendment right to counsel. Hunt had the right to have an attorney at custodial interrogations, and if she requested the assistance of counsel, subsequent questioning could occur only upon Hunt's initiation. *Roberson*, 486 U.S. at 681; *Edwards*, 451 U.S. at 484.

¶72. The record shows that they read Hunt her rights and then she signed a Waiver of Rights form. After she understood her rights she then asked if it were time to call her attorney. I think there could be no clearer indication of an individual asserting her right to counsel then the case here.

¶73. Why did the Officer deny Hunt the right to counsel? And what right does a free individual, not

in custody, have to an attorney? No one has the right to have an attorney present ***unless*** they are in custody the majority holds today. The majority's holding will allow an officer the opportunity to get around the Fifth Amendment's right against self-incrimination by merely questioning someone until they get what they need, while continuing to deny all requests for an attorney, thus rendering the safeguards of ***Miranda*** ineffective.

¶74. At the end of the day everyone connected with this case found that Hunt was in custody, except the majority. The officer thought Hunt was in custody, he read Hu nt her ***Miranda*** rights; the trial judge thought Hunt was in custody, he found that she had waived her right to counsel; lastly, Hunt thought she was in custody, she invoked her ***Miranda*** rights. I am at a complete loss, in the presence of these facts, how the majority finds Hunt was not in custody. I side with the people who were there, accordingly I dissent.

## WHETHER THE TRIAL COURT ERRED BY DENYING TINA HUNT DISCOVERY, DUE UNDER RULE 4.06 OF THE UNIFORM CRIMINAL RULES OF CIRCUIT COURT PRACTICE, AND BY DENYING A DELAY IN THE TRIAL SETTING?

¶75. Hunt correctly asserts the State failed to supply her with the names of the witnesses it intended to call at trial, over an unsuccessful objection. Hunt requested discovery pursuant to Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice (now Uniform Circuit and County Court Rule 9.04) and later she expanded that request. She filed two motions to compel discovery, the second of which included a request that the court require the prosecutor to distinguish between the persons it intended to call as witnesses during the trial of the case and persons who may have some knowledge about the case. The court denied this motion. The State produced a list of "witnesses" to the defense fewer then two weeks before the trial began. Because of misspelled names and the fact that addresses were not included with most of the witnesses listed by the State, it was and still is difficult to decide the exact number of potential witnesses disclosed by the State. The defense states that the number was between sixty-seven and seventy-two, taking into consideration duplications. The list included people who wrote letters for Thomas Hunt's family interested only in the custody of the child of Tina and Thomas Hunt. The list also included the persons who conducted the funeral services for Thomas Hunt. The State called nine witnesses.

¶76. Hunt asked the trial court for assistance. She asked that the State, pursuant to Rule 4.06(a)(1), separate from among the witnesses disclosed those who would actually be used during the trial in chief. The lower court refused this. Hunt's attorney then requested the funds for an investigator who could dedicate his time and energy to locating and interviewing the witnesses listed. This was refused. Then Hunt's attorney sought a continuance so that witnesses could be interviewed and other preparations made for trial. Again this was refused.

¶77. "[E]ven the most meticulous discovery is useless if not timely. Discovery, to be sufficient, must be made at a time far enough in advance of trial to give the defense a 'meaningful opportunity' to make use of it." ***Stewart v. Mississippi***, 512 So. 2d 889, 892 (Miss. 1987) (citing ***Turner v. State***, 501 So. 2d 350, 352 (Miss. 1987); ***Page v. State***, 495 So. 2d 436, 443 (Miss. 1986)(Dan Lee, J., dissenting)).

¶78. This Court has noted that "Rule 4.06 and the ***Box*** guidelines are designed to avoid 'ambush' or unfair surprise to either party at trial." ***Holland v. State***, 587 So. 2d 848, 866-67 (Miss. 1991). As

articulated in ***Davis v. State***, 530 So. 2d 694 (Miss. 1988), the guidelines for discovery set out in ***Box v. State***, 437 So. 2d 19 (Miss. 1983), provide as follows:

> (1) Upon the defense's objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.

> (2) If after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.

> (3) If the defendant does request a continuance the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence the trial court must grant the requested continuance.

***Davis***, 530 So. 2d at 698 (citing ***Box***, 437 So. 2d at 23-26).

¶79. A continuance, as contemplated by ***Box***, simply postpones or adjourns the action to a later date. Mississippi case law provides that the failure to request a continuance constitutes a waiver. ***Davis***, 530 So. 2d at 698.

¶80. "Where the state is tardy in furnishing discovery which it was obligated to disclose, the defendant is entitled upon request to a continuance or postponement of the proceedings [sic] reasonable under the circumstances." ***Stewart***, 512 So. 2d at 892-93. Under our caselaw, a trial court should consider a grant of continuance when confronted with a discovery violation. ***Duplantis v. State***, 644 So. 2d 1235, 1249-50 (Miss. 1994), ***cert. denied*** 115 S. Ct. 1990 (1995).

¶81. Where the state is tardy in furnishing discovery which it was obligated to disclose, the defendant is entitled upon request to a continuance postponement of the proceedings reasonable under the circumstances. ***Foster v. State***, 484 So. 2d 1009, 1011 (Miss. 1986) (citing ***Henry v. State***, 484 So. 2d 1012, 1014 (Miss. 1986); ***McKinney v. State***, 482 So. 2d 1129, 1131 (Miss. 1986); ***Cabello v. State***, 471 So. 2d 332, 343 (Miss. 1985), ***cert. denied*** 476 U.S. 1164 (1986); ***Box***, 437 So. 2d at 26 (Robertson, J., concurring)).

> *Without question one accused of a crime is entitled to disclosure from the prosecution of "names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial."* A written request made by the defense is all that is necessary to impose upon the prosecution the obligation to make discovery--and to make discovery seasonably.

***Foster***, 484 So. 2d at 1011 (emphasis added) (citing Unif. R. Cir. Ct. Prac. 4.06(1); ***Morris v. State***, 436 So. 2d 1381, 1387 (Miss. 1983)).

¶82. "We also reiterate to prosecuting attorneys and defense attorneys alike our commitment to the proposition that 'justice is more nearly achieved when, well in advance of trial, each side has reasonable access to the evidence of the other.'" ***Moore v. State***, 536 So. 2d 909, 911 (Miss. 1988) (quoting ***Box***, 437 So. 2d at 21).

¶83. "Discovery, to be sufficient, must be made at a time far enough in advance of trial to give the

defense a 'meaningful opportunity' to make use of it." ***Stewart***, 512 So. 2d at 892. ***See also***, ***Turner v. State***, 501 So. 2d 350 (Miss. 1987); ***Gray v. State***, 487 So. 2d 1304 (Miss. 1986); ***Henry v. State***, 484 So. 2d 1012 (Miss. 1986); ***McKinney v. State***, 482 So. 2d 1129 (Miss. 1986). "A request is all that is necessary." ***Stewart***, 512 So. 2d at 891. "Having received the untimely discovery furnished by the State, the defense was entitled to a reasonable opportunity to make use of it. This includes a reasonable opportunity to locate and interview newly discovered witnesses, if a continuance was necessary to accomplish this, then the defense was entitled to a continuance." ***Inman v. State***, 515 So. 2d 1150, 1154 (Miss. 1987). A "request to make discovery is sufficient to oblige the prosecution to do so." ***Thomas v. State***, 488 So. 2d 1343, 1344 (Miss. 1986) (citing ***Foster***, 484 So. 2d at 1011).

¶84. Since Hunt was in the dark about any of the prosecution witnesses, presumably until the State called them, Hunt's prejudice is great. However, the majority now adds a new requirement to parties alleging discovery violations. Now, the majority holds, that the party asserting the violation must state that the lack of discovery worked to their detriment. It is not enough for the majority that the defense was given a list of seventy-two potential witnesses (**not** the witnesses the State intended to call at trial), fewer then two weeks before the trial, and at trial the defense had no idea whom the State intended to call as witnesses until they called them. So now the majority adds the requirement that the defense show prejudice when witnesses are called by surprise during trial. The law promulgated by the majority would allow for anyone to circumvent Rule 4.06 and not disclose the witnesses they intend to call at trial and then claim that since the other party cannot show prejudice the violation is well within their right.

¶85. Hunt's counsel should have been allowed a reasonable period in which to interview the potential witnesses. I cannot say that the attorney was not ambushed or prejudiced by not interviewing the witnesses.

## WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED TINA HUNT FUNDS TO EMPLOY AN INVESTIGATOR, DENYING HUNT HER CONSTITUTIONAL RIGHTS?

¶86. Hunt made a motion for funds to hire an investigator to interview persons on the State's witness list, since the State provided only partial information on thirty anticipated witnesses of the sixty-seven to seventy-two witnesses listed by the State. The State acknowledged that several witnesses they listed lacked addresses or phone numbers.

¶87. On November 21, 1991, when Hunt's counsel motioned for an investigator to interview the State's witnesses, he noted he had forty-five to fifty witnesses left to interview, and that he could not complete those interviews before the trial began. The trial court denied Hunt's motion and ruled that it could not find a sufficient need to justify an investigator.

¶88. The standard of review in Mississippi on this issue is as follows: to reverse, the trial court's denial of expert assistance must be an abuse of discretion "so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair." ***Fisher v. City of Eupora***, 587 So. 2d 878, 883 (Miss. 1991). ***See Johnston v. State***, 529 So. 2d 577, 590 (Miss. 1988).

¶89. Hunt did more than present a mere request; her counsel placed in the record the fact that the State had sixty-seven to seventy-two witnesses on its potential witness list, and that he had only

interviewed between sixteen and eighteen witnesses by November 21, 1991, only nine days before trial.

¶90. The issue dealing with funds for an investigator is troubling since a continuance or an order compelling the State to separate from among the witnesses revealed, those who would actually be used, would have been all that was necessary. Since the State only called nine witnesses, Hunt could have interviewed these witnesses in the nine days it had left before the trial. I understand that the State may not have had a firm commitment on the exact witnesses it planned to call for the trial, but narrowing down the potential witness list would have resolved the problems that have occurred in this case, and Hunt's counsel would not have needed to move for an investigator. Saying that funds for an investigator should have been required is vexatious, when the much more expeditious manner would have been a continuance or a more accurate witness list. Considering my opinion on the above issue, I find that the appropriate action for the trial judge to have taken would have been to grant a continuance or order the State to narrow its witness list.

¶91. Based on the foregoing, the lower court should have suppressed Hunt's written statement because it was the product of an illegal custodial interrogation; one that occurred without the presence of counsel after the right to counsel had been invoked. Also, because the trial judge refused to grant Hunt a reasonable continuance under the circumstances, this conviction must be reversed and the case remanded for a new trial.

**PITTMAN, BANKS AND McRAE, JJ., JOIN THIS OPINION.**

1. Langston's testimony was that he telephoned Tina at the request of her aunt "to check on Tina." He called in a legal capacity, but he represented Scott Hindman, one of the co-defendants in this crime. (Tr. 153)

2. . . . police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction of a person's freedom as to render him "in custody."

*Moore v. State*, 344 So. 2d 731, 734 (Miss. 1977) (quoting *Oregon v. Mathiason*, 429 U.S. 495 (1977)).

3. The fact that an attorney was trying to contact Tina is of no consequence. *See Moran v. Burbine*, 475 U.S. 412 (1986).

4. There is an additional argument which is not specifically addressed as an assignment of error, but is

nevertheless presented as a paragraph in Tina's brief. Tina states that she was found guilty of accessory before the fact to murder, even though the principals to the crime were guilty of manslaughter, as part of a plea agreement. Tina objects on these grounds at trial, stating there must be a murder in order to have an accomplice to a murder.

This argument is without merit. *See State v. McAllister*, 366 So. 2d 1340, 1343 (La. 1978); *see, e.g., Oaks v. People*, 424 P.2d 115, 117 (Colo. 1967); *Oates v. State*, 627 A.2d 555, 560 (Md. Ct. Spec. App. 1986).